

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-16-00070-CR

Terrence **MOUTON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 14, Bexar County, Texas
Trial Court No. 416377
Honorable Susan Skinner, Judge Presiding

Opinion by:     Patricia O. Alvarez, Justice

Sitting:        Marialyn Barnard, Justice
                Patricia O. Alvarez, Justice
                Jason Pulliam, Justice

Delivered and Filed:  December 28, 2016

AFFIRMED

On February 3, 2016, Appellant Terrence Mouton was found guilty of thirty-six counts of cruelty to nonlivestock animals; the following day, the jury assessed punishment at 365 days' confinement in the Bexar County Jail and a $4,000 fine on each count. The trial court ordered the sentences to run concurrently. In his sole issue on appeal, Mouton contends the trial court erred in denying his motion for directed verdict based on the State's failure to prove the animals in question were in Mouton's custody. We affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 13, 2012, San Antonio Animal Care Services (ACS) responded to a call for chained dogs at a rural location on Fest Road in Bexar County, Texas. From the adjacent property, the ACS employee could see approximately twenty underweight dogs that appeared to have some scarring. The only water visible was green, stagnant water in buckets.

Sergeant Jason Layman, with the Bexar County Sheriff's Office, obtained a search warrant and coordinated with ACS to seize the dogs. Although no one appeared to be at the residence when the officers arrived, the officers located thirty-six pit bull terriers on the premises. The animals were chained, significantly underweight, and dehydrated with access only to undrinkable water; additionally, there was no available food, only a few had shelter, and the area was infested with mosquitoes, ticks, and fleas. According to ACS, many of the dogs had scarring consistent with fighting. Specifically, the dogs suffered from scars on their heads, necks, and legs, had missing upper lips, and broken teeth. One of the ACS employees testified that the manner in which the dogs were kept was not the generally accepted or lawful form of conduct for maintaining dogs.

While the dogs were being secured, Mouton arrived at the residence. He told the officers that he had been living at the residence for a couple of weeks, but that he did not own all of the dogs. Mouton further relayed that he was holding the dogs for someone else, but did not provide the officers with the individual's name or information. Mouton explained that he worked in LaSalle County, in the oilfields, but that the dogs were taken care of when he left.

Mouton was charged with thirty-six counts of cruelty to nonlivestock animals by intentionally, knowingly, and recklessly failing unreasonably to provide necessary food, water, care, and shelter for an animal in his custody. *See* TEX. PENAL CODE ANN. § 42.092(b)(3) (West 2016).

After the conclusion of the State's case, the defense's request for a directed verdict was denied. The defense called several witnesses, including Mouton. Following the three-day jury trial, Mouton was found guilty on thirty-six counts of cruelty to nonlivestock animals and the jury assessed punishment at 365 days' confinement in the Bexar County Jail and a $4,000 fine on each count. The trial court ordered the sentences to run concurrently.

On appeal, Mouton contends that because the evidence is insufficient to support the convictions, the trial court erred in denying his motion for directed verdict. More specifically, Mouton contends the State failed to prove that the dogs were in Mouton's custody.

## CRUELTY TO NONLIVESTOCK ANIMALS

### A. Standard of Review

An appellate court reviews a challenge to a trial court's denial of a motion for directed verdict under the same standard we use to review a legal sufficiency challenge. *Hines v. State*, 383 S.W.3d 615, 623 (Tex. App.—San Antonio 2012, pet. ref'd); *Sony v. State*, 307 S.W.3d 348, 353 (Tex. App.—San Antonio 2009, no pet.) (citing *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996)). "Under the legal sufficiency standard, we must review all of the evidence in the light most favorable to the verdict to decide whether . . . a rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Hines*, 383 S.W.3d at 623; *see also Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The jury is the exclusive judge of the credibility of the witnesses and the weight to be given to testimony, and we must defer to its determinations. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Hines*, 383 S.W.3d at 623. The jury may choose to accept or reject all or part of the testimony, and we must resolve any conflicts or inconsistencies in the evidence in favor of the jury's verdict. *See Brooks*, 323 S.W.3d at 899; *Hines*, 383 S.W.3d at 623.

We review circumstantial and direct evidence in the same manner, and circumstantial evidence alone can be sufficient to establish a defendant's guilt. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012) (citing *Hooper*, 214 S.W.3d at 13); *Hines*, 383 S.W.3d at 623; *see also Thomas v. State*, 352 S.W.3d 95, 99 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). After reviewing the evidence in the light most favorable to the verdict, we will uphold the verdict "unless a rational factfinder must have had reasonable doubt as to any essential element." *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009); *Hines*, 383 S.W.3d at 623.

### B.      Arguments of the Parties

Mouton contends that he made proper and reasonable arrangements for the care of the dogs before he left for LaSalle County and that no rational juror could have found that these animals were in his custody on the date alleged.

The State counters that the evidence shows Mouton rented and lived on the property, he owned several of the dogs on the property, he received payment for allowing others to keep their dogs on the property, and he acknowledged his responsibility for providing for them.

### C.      Custody

"A person commits an offense if the person intentionally, knowingly, or recklessly . . . fails unreasonably to provide necessary food, water, care, or shelter for an animal in the person's custody." TEX. PENAL CODE ANN. § 42.092(b)(3); *see also Thomas*, 352 S.W.3d at 99. "'Necessary food, water, care, or shelter'" includes the food, water, care, or shelter that is "required to maintain the animal in a state of good health." *Id*. § 42.092(a)(7). "'Custody'" is defined to include "responsibility for the health, safety, and welfare of an animal subject to the person's care and control, regardless of ownership of the animal." *Id*. § 42.092(a)(4).

**D.    Analysis**

Mouton does not contest that the dogs were not in a state of good health when they were found by ACS.  He contends, however, that the State failed to prove the dogs were in his custody.  In our analysis, we consider both direct and circumstantial evidence, *see Merritt*, 368 S.W.3d at 525; *Hines*, 383 S.W.3d at 623; *Thomas*, 352 S.W.3d at 99, but remain mindful of the need to view the testimony in the light most favorable to the jury's verdict, *see Hooper*, 214 S.W.3d at 13; *Hines*, 383 S.W.3d at 623.

On September 13, 2012, ACS was contacted regarding the potential mistreatment of animals.  When ACS and the Sheriff's Office deputies arrives at the scene, there were thirty-six pit bull terriers that were malnourished, dehydrated, and showed evidence of scars.  While the officers and ACS employees were tending to the scene, Mouton arrived on the property with a female companion.  He identified himself as "having been living in the home."  Sergeant Layman opined that it was "obvious that [Mouton] had lived there."  Mouton invited Sergeant Layman into the house and the officer saw Mouton's belongings inside the house; "he was either moving in— just moving in or just moving out, because there was a lot of stuff that was still in boxes."

Several witnesses testified that, on the day in question, Mouton acknowledged that he was living at the house on Fest Road.  "[H]e had been living at the property for a couple of weeks, [but] he was not the owner of all of the dogs that were there."  In fact, Mouton's own witness, Christopher Pope, testified that Mouton was living in the house on the day in question.  "[H]e was renting—he rented the house and the land there, yes, and he allowed me to put my dogs on his rented property—his property.

Additionally, when Mouton arrived at the property, he told officers that he was holding the animals for someone else; but he never indicated who owned the dogs that he asserted did not belong to him.  Mouton also offered that "he did care for the dogs.  He had a girlfriend living there

with him at the time that took part in the feeding and watering, and whatever care was provided [for] the dogs." At some point during the conversation, Sergeant Layman indicated the conversation "just wasn't a good conversation." Mouton did not appear to want to speak to the officers anymore so Sergeant Layman stopped the interview.

Mouton's testimony at trial, however, was completely different. Mouton testified that he never moved into the house on Fest Road. Mouton contended that in the fifty-two days leading up to the seizure, he had worked and lived in LaSalle County. Mouton testified that he had requested a transfer to Elmendorf a day or two before the officers seized the animals and was in Elmendorf on the day in question.

Mouton further testified that a friend and Mouton's girlfriend moved the dogs over to the property and they moved his girlfriend into the house. He explained that he was "out in the oil field" and that September 13, 2012, was the first time he was even at the property. Mouton acknowledged owning six of the dogs located on the property. He testified that when he left for LaSalle, there were not thirty-six dogs on the property and his dogs were not in the condition in which they were found by the officers. He also identified an individual named Mars, as the caretaker, and Kendall, as another person who fed and watered the dogs. Mouton testified that he provided money and dog food. The property had running water and Mouton believed the dogs were being fed and watered by Mars.

Mouton was adamant that he first learned there were problems with the animals when he received calls about the dogs being on the news. It was because of the news broadcast that Mouton went to the property that afternoon. Mouton testified that when he arrived, he was surprised and saddened and that he never intended for the animals to be mistreated. He further explained that the dogs were moved to the property by a friend—after Mouton was already moved to LaSalle. On cross-examination, Mouton testified that he only took responsibility for the dogs on the day in

- 6 -

question because Sergeant Layman threatened to throw Mouton's girlfriend in jail; only then did Mouton say, "These dogs are mine. I will take 100 percent responsibility."

The defense called Christopher Pope who testified that he owned several of the dogs in question—fourteen adults and four puppies. Mouton allowed Pope to move the dogs onto the property when Pope's landlord would not allow the animals. Pope testified that he contracted with a third-party to feed and water the dogs and believed the dogs were being taken care of; unfortunately, the individual being paid to care for the dogs was in jail for other charges and no one informed Pope. Pope testified that he and Mouton took food out to the property once a month.

During cross-examination, Mouton acknowledged that he owned six of the dogs and that he allowed other people to put their dogs on the property "for a little bit of money." He further testified that he was evicted from his last rental home because the owner did not like that Mouton "had somebody off the streets live at the house." This testimony, however, was directly negated by the homeowner, James Garcia, who testified that Mouton was evicted because Mouton did not care for the property or the animals on the property. Garcia described "lean" dogs with wounds; in particular, one dog's "jaws were cut up and his skin was completely removed on the jaw itself. He had been in a fight it seemed."

When describing the property, Sergeant Layman asserted that he did not believe "there [was] any way you could not know those dogs were on your property." He continued,

> some of the dogs were very close to the house, and if you saw that dog—we were near that dog—you would see the next dog and the next dog. As you go farther back on the property, as long as you see one dog, you could see the next dog. There was no way you could miss that those dogs were on your property.

Sergeant Layman explained, without objection from the defense, that in his opinion, Mouton maintained care, control, and custody of the dogs in question.

During the motion for directed verdict, Mouton asserted the State failed to establish a chain or a link between Mouton's actions and the actions which led to the neglect of the animals. Mouton's assertions, however, are negated by his own testimony. The jury is the sole judge of both witness credibility and the weight to be given each witness's testimony. *Brooks*, 323 S.W.3d at 899; *Hines*, 383 S.W.3d at 623. Here, the jury could have reasonably believed the ACS employees' testimony, and the officers' testimony, over that of Mouton's. They could have further believed Mouton's statements on the day in question over Mouton's testimony during the trial.

Viewing all of the evidence in the light most favorable to the jury's verdict, and resolving all conflicts or inconsistencies in favor of that same verdict, we conclude a reasonable jury could have found that Mouton was responsible for the health, safety, and welfare of the dogs on his property and that the dogs were subject to his care and control, regardless of whether he was the actual owner of each animal. *See Hooper*, 214 S.W.3d at 13; *Hines*, 383 S.W.3d at 623. More specifically, based on the evidence presented at trial, a reasonable juror could have concluded that the dogs in question were under Mouton's care and control. Additionally, we conclude that, based on the circumstantial evidence, a reasonable jury could have found that Mouton was "aware of, but consciously disregarded, a substantial and unjustifiable risk" that he failed to provide proper nutrition, water, or shelter for the dogs. *See Thomas*, 352 S.W.3d at 101.

## CONCLUSION

Having found the evidence legally sufficient to support, beyond a reasonable doubt, each element of the offenses charged, we conclude the trial court did not err in denying Mouton's motion for directed verdict, and we affirm the trial court's judgment.

Patricia O. Alvarez, Justice

PUBLISH