# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00357-CR

---

**Dana Boehm, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM COUNTY COURT AT LAW NO. 5 OF WILLIAMSON COUNTY**
**NO. 21-01658-1, THE HONORABLE WILL WARD, JUDGE PRESIDING**

---

## O P I N I O N

Dr. Dana Boehm challenges her misdemeanor conviction for cruelty to a non-livestock animal. She argues the evidence at trial was insufficient to show that she failed unreasonably to provide necessary care to an animal in her custody. She also argues that the trial court erred in its jury instructions by including the alleged manner and means of prescribing and administering contraindicated medication because (1) an "act" cannot be prosecuted as a failure to provide necessary care as can an "omission" and/or (2) no evidence supported the act. Finally, she argues that the trial court erred in its jury instructions by including the culpable mental state of recklessness. *See* Tex. Penal Code § 42.092.[1] Finding the evidence sufficient and no error in the jury charge, we affirm.

---

[1] The 2017 version controls here. *See* Act of May 28, 2017, 85th Leg., R.S., ch. 576, § 1, 2017 Tex. Gen. Laws 1563 *amended by* Act of May 25, 2017, 85th Leg., R.S., ch. 739, § 3, 2017 Tex. Gen. Laws 3157, 3158.

# BACKGROUND

Before going on vacation, Osvaldo Silva Jr., arranged for his father-in-law Henry Flores to drop Jax, his Old English Bulldog, off with Jax's regular veterinarian, Dr. Boehm, for boarding. Dr. Boehm ran the Animal Wellness Hospital (AWH or the clinic) in Taylor. Silva had boarded Jax with Dr. Boehm before, four or five times without incident. Like other bulldogs, Jax had issues with his spine and was bow-legged. Flores dropped Jax at the clinic on March 13, 2021, and planned to pick him up on March 20, 2021. Because of the pandemic, Flores did not himself enter the clinic.

On March 16, Silva contacted the clinic to see how Jax was doing and was told Jax was fine and playing with the other dogs. On March 19, Dr. Boehm texted Silva. The text read "Jax has been different since he arrived." The text stated Jax needed help getting into the clinic, had a urinary tract infection, urinated as he arrived, and had been grazing but not eating a lot. "Definitely not his normal self." It concluded, "Have you noticed these changes at home?"

Flores went to pick up Jax on the morning of March 20; Jax was carried out on bed sheets, "like a pack of potatoes," and had bandages on his hind legs. Jax smelled of urine and appeared drugged. Dr. Boehm told Flores she had given Jax a pill that made him that way, gave Flores a set of pills, and indicated that Jax needed to go to an animal hospital to have his spine checked. Flores and his wife had difficulty getting Jax out of the back seat of their car; they had to carry him using towels as a sling. Jax urinated as he was helped into the house. Once inside, they laid Jax in his bed. Jax was "very limp," "like a zombie," and "didn't raise his head up at all." Jax never got up out of the bed. When the Silvas came home that evening they removed the bandages and tried to give Jax a bath; he was covered in urine and smelled of urine and feces; they still could not get the urine off him.

2

Silva took Jax to the Austin Veterinary Emergency and Specialty Center (AVES) in Austin that night. Jax arrived with skin irritation, wounds on his hind legs, abrasions on his belly and scrotum, an elevated heart rate and an inability to stand or walk on his hind limbs.

Dr. Lindsay Vaughn, a veterinarian and the owner of AVES, noted that her staff did many things to treat Jax following his admission to the hospital. Staff shaved the fur surrounding his wounds—which she estimated had been there three to seven days—so that they could adequately scrub and clip them; gave him a chlorhexidine bath; bandaged his wounds; placed a urinary catheter; gave him medication; put soft bedding in his kennel; and turned him over every four hours.

Jax's condition initially improved but then deteriorated further. By March 22, Jax had a new wound on his "hind end," where the skin was irritated and abraded, and it "opened up with infected material." At that point, Dr. Vaughn believed Jax had more of a "systemic bacterial infection." On March 24, the Silvas made the decision to euthanize Jax.

Silva contacted the Williamson County Sheriff's Office, and Detective Rebecca Loegel investigated the case. Detective Loegel looked at March 13 "video footage from the interior of the Silvas' house and saw that Jax was walking of his own accord and following the family alone, and he didn't have any noticeable conditions." And she viewed video that showed Jax immediately after he was picked up from Dr. Boehm's, where "[h]e had to be carried by two individuals into the house. He was completely not mobile." Loegel spoke with some of the veterinarians at AVES and obtained a search warrant for AWH. Two months after Jax's boarding, Loegel searched the property.

The Assistant County Attorney filed an information alleging Class A misdemeanor animal cruelty. The information alleged, in relevant part, that Dr. Boehm had intentionally,

3

knowingly, and recklessly failed unreasonably to provide necessary care to Jax by: "failing to remove Jax from his waste; failing to care for his wounds; and prescribing and administering medications which are contraindicated, to wit: prednisone and Galliprant[.]"

At a jury trial, the State put on several witnesses including Flores, Silva, Dr. Vaughn, and Detective Loegel. The jury saw video exhibits—footage from the Silvas' home and AWH—and photographs of Jax's wounds. Both the State and the Defense put on veterinary experts. The defensive theory was that Dr. Boehm had provided adequate care: she messaged Jax's family with her concerns about his health; she removed Jax from his waste; she treated Jax's wounds; and she gave Jax medication. The Defense expert testified that Jax's issues stemmed from his chronic spinal condition, something the Silvas never sought treatment for. But the crux of the defense was that nobody knew what had happened with Jax because no cultures or samples were tested and no necropsy was done. The Defense also argued that Dr. Vaughn and the State's expert had confused best practices in veterinary care ("professional care") for the necessary care described in the statute.

The jury convicted Dr. Boehm of the offense, and the trial court assessed punishment agreed to by the parties at one year in State jail and a $4,000 fine—both probated for 18 months. The trial court also ordered Dr. Boehm to submit to an 18-month voluntary surrender of her veterinary license effective May 15, 2024, for the purpose of shutting down her practice, and that she pay Silva restitution in the amount of $6,040.64.

## ANALYSIS

### Sufficiency

Dr. Boehm argues that the evidence is insufficient under all means alleged. First, she could not have committed the offense by "prescribing and administering medications which

4

are contraindicated" because only omissions, not acts, can constitute an offense under section 42.092(b)(3), and/or there was no evidence she prescribed and administered contraindicated medications. Second, she could not have committed the offense by "failing to remove Jax from his waste" or "failing to care for Jax's wounds" because the offense does not include a reckless state of mind and the evidence is insufficient to show a knowing and/or intentional state of mind.

*Standard of Review*

The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by sufficient evidence. *See Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979). In assessing the sufficiency of the evidence to support a criminal conviction, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

For purposes of a sufficiency review, the "essential elements of the crime" are the elements of the offense as defined by the hypothetically correct jury charge for the case. *Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012). That charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id*.

*Application*

The applicable statute provides that "[a] person commits an offense if the person intentionally, knowingly, or recklessly . . . fails unreasonably to provide necessary food, water, care, or shelter for an animal in the person's custody." Tex. Penal Code § 42.092(b)(3). It also provides, "'Necessary food, water, care, or shelter' includes food, water, care, or shelter provided to the extent required to maintain the animal in a state of good health." *Id*. § 42.092(a)(7).

The hypothetically correct jury charge

Before we address sufficiency, we address the hypothetically correct jury charge because the parties disagree about what mens rea it would include. Dr. Boehm argues that the charge would not include the reckless mens rea (though that is included in the statute); the State argues that it would (as the actual charge did in this case).

Dr. Boehm's arguments are based on the definitions of culpable mental states set out in Texas Penal Code section 6.03. *Id*. § 6.03(a), (c). Dr. Boehm argues that:

- a subsection 42.092(b)(3) offense is a combined nature of conduct ("the failure to provide care") and circumstances of conduct ("the failure is unreasonable" and "the care is required to maintain the animal in good health") offense;

- the nature of conduct element ("the failure to provide care") can only be committed intentionally or knowingly because subsection 6.03(c) only defines the reckless mens rea as it relates to circumstances surrounding conduct or result of conduct; and

- the circumstances of conduct elements ("the failure is unreasonable" and "the care is required to maintain the animal in good health") can only be committed knowingly because the mental state that modifies the nature of conduct also modifies the circumstances that make the conduct an offense and subsection 6.03(a) only defines the intentional mens rea as it relates to the nature of conduct or result of conduct.

6

*See id*. §§ 6.03, 42.092(b)(3).  Dr. Boehm argues that the hypothetically correct jury charge would require proof that she intentionally or knowingly failed, knowing that the failure was unreasonable, to provide care for Jax that she knew was required to maintain the animal in a state of good health.

We agree with the State that because subsection 42.092(b) states that the offense can be committed "intentionally, knowingly, or recklessly," the jury charge correctly incorporated the reckless mens rea.  When section 42.092 was enacted, the Legislature added the mens rea of recklessness, which had not been present in the original animal-cruelty statute and is still not present in the current statute covering cruelty to livestock animals.[2]

All offenses require some kind of voluntary conduct (be it an act, omission, or possession). *Id*. § 6.01.  So, in some sense, all offenses contain a nature of conduct element.  The San Antonio court has stated that the cruelty offense is a nature of conduct offense, but it did so based solely on a laundry list of offenses set out in *Amaya v. State* that are inherently criminal in nature.  *Cardoso v. State*, 438 S.W.3d 815, 823 (Tex. App.—San Antonio 2014, no pet.) (citing *Amaya v. State*, 733 S.W.2d 168, 174 (Tex. Crim. App. 1986)).  But, as Dr. Boehm recognizes, some subsection (b) offenses are at least partially defined by a result, like bodily injury or serious bodily injury to the animal.  *See* Tex. Penal Code § 42.092(b)(1), (2), (6).  Whether the subsection (b) offense at issue here is first and foremost a nature or result or circumstances of conduct offense is a matter of semantics.  Subsection (b)(3), whatever its primary focus, requires a result too—the unreasonably, uncared–for animal.  There is no offense if there is no unreasonably uncared-for animal.  In fact, there is no offense under any of the (b)(3) offenses in the absence of the cruelly–treated animal—the tortured, poisoned, unreasonably–uncared-for, unreasonably–abandoned,

---

[2] *Compare* Act of May 23, 2007, 80th Leg., R.S., ch. 886, § 2, 2007 Tex. Gen. Laws 2163, 2165, *with* Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 42.11, 1973 Tex. Gen. Laws 883, 957-98; *see also* Tex. Penal Code § 42.09(a).

7

cruelly–confined, injured, made-to-fight, made-to-be-a-lure, or seriously–overworked animal. *See id*. § 42.092 (b) (1)-(9). We disagree with Dr. Boehm's underlying premise that a person cannot recklessly (or intentionally), unreasonably fail to provide necessary food, water, care, or shelter for an animal in the person's custody. We will not write the reckless mens rea out of the statute based on the definitions set out in section 6.03. *Id*. § 6.03.

The hypothetically correct jury charge cannot unnecessarily increase the State's burden of proof or unnecessarily restrict its theories of liability. *Johnson*, 364 S.W.3d at 294. Erasing the reckless mens rea from it here would do both.

The *Jackson* review

When the charge authorizes the jury to convict the defendant on more than one theory, as it did in this case, the verdict of guilt will be upheld if the evidence is sufficient on any theory authorized by the jury charge. *Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013).

The evidence presented to the jury—viewed in the light most favorable to its verdict—was sufficient to show that Dr. Boehm recklessly and unreasonably failed to provide Jax necessary care by failing to remove Jax from his waste. The State put on evidence that supports the following reasonable inferences and/or conclusions:

*Dr. Boehm knew Jax had issues with his spine and with staying clean.*

- Dr. Boehm, in 2018, 2019, and 2020, recorded Jax's issues with his spine and his worsening orthopedic issues which resulted in him "shuffling on all four limbs" and getting callouses on both tarsi. She repeatedly referred the Silvas to specialists and had prescribed Galliprant and Rjensa joint care chews.

- Jax had urinary issues during a prior boarding; Dr. Boehm's records reflected that when he was boarded in 2019, when he was two years old, he was not potty trained and required multiple baths a day.

8

- Brooke DeAngelis, who worked at the clinic as a teenager, testified that when she brought Jax inside for the March 2021 boarding, "he was slipping on the tile" and he "urinated on the floor of the clinic a few times" while she was bringing him to the back. She told Dr. Boehm what she "had seen."

- Preslie Havens, another teenager who worked at the clinic, testified that she gave Jax a bath and noticed that he was "acting weird" and "off balance" and "not getting around super great." When she told Dr. Boehm about it, Dr. Boehm told her "not to mess with him again."

- Heidi Latham, who volunteered at the clinic, testified that on the day Jax was set to leave boarding, "I went in there to check him just because I knew Jax had—was kind of a messy little boy, like most animals are when they are away from home." Jax "[j]ust tended to like to urinate and defecate in his kennel, like frequently, probably." He was fine but fifteen minutes later, Dr. Boehm said she needed to clean him up because he was about to be picked up. Latham had to hold Jax up because "[h]e couldn't—he couldn't stand there for very long on his own. He kept sliding back down with his back legs." They had to carry him out on a sling because he could not get his feet underneath him. "He urinated the whole walk out there."

*Dr. Boehm's clinic was a mess, and she may have unreasonably and recklessly taken on more pets than she could handle.*

- The 13 minutes of body-cam footage from Detective Loegel's search showed the clinic to be, apart from a couple of areas, a cluttered mess, and not a newly created one, an embedded one. There were many, many dogs (and a few kittens) all in cages in several different areas, including out behind the clinic. Some of the animals were in clean cages; some were in soiled cages; and some were in very soiled cages with several piles of waste and pooled urine. A couple of the smaller dogs were caked with waste. Most of the cages were metal with no bedding. There were many empty soiled cages. There were stacks of dirty tools and tubing laying in sinks waiting to be washed; used syringes here and there, some containing and/or leaking liquid; and medicines lying out in the open. Out back there were stacks of junk, including wiring; the fence was in a state of disrepair; and numerous bottles of chemicals were lying around on the astroturf, as well as old paint, dirty bedding, and machinery.

- DeAngelis testified that when interviewed, she told Detective Loegel that the clinic was pretty messy, and that her sister, who had also worked there, considered the clinic too hectic.

- Havens testified that the clinic "was very cluttered and unclean. There was a lot of poop and pee in kennels when I would get there in the evenings to clean up. There were a lot of medications laying around, things like that."

9

- Dr. Boehm's expert, Dr. Kenyon Conklin testified that "the video definitely shows a clinic that is highly cluttered, disorganized, the presence of sharps, meaning needles, and also I believe there were scalpel blades out that were not appropriately policed up . . . pills out, and they looked like they were mixed together . . . medications that were—that were out that should have been locked up[.]"

*Dr. Boehm was aware of Jax's wounds before he was discharged from the clinic.*

- State's Exhibits 13 and 14, photographs extracted from Dr. Boehm's phone dated March 20, showed wounds on Jax's hind limbs.

*Jax's health declined at the clinic.*

- State's Exhibit 5-1, video from Silva's house on the morning of March 13, shows Jax walking around the house, following Silva and his wife. State's Exhibit 5-2 and 5-3, security videos from the morning of March 20, show Flores and his wife carrying Jax, who could not walk, into the house, using towels as a sling.

*Jax suffered "urine scald" while boarded with Dr. Boehm because he was not kept in a clean and dry environment and the urine scald led to wounds on Jax's bony prominences that became infected because of the unclean environment.*

- Dr. Vaughn testified that the doctor that evaluated Jax when he first came to AVES noted that Jax had irritation of his chest and his abdomen, which was concerning for urine scald. She stated that if animals are "not in a clean and dry environment, then they can develop urine scalds. So their urine will—that is very acidic, will lay against their skin and cause irritation and abrasion of that skin, which can allow bacteria to introduce into the effected skin and get an infection." When Dr. Vaughn was asked whether she saw evidence that "Dr. Boehm provided necessary boarding accommodations such as appropriate bedding, padding, in his kennel, anything like that?" she stated, "Not—not based on the—what was perceived as urine scald on his belly and the wounds on his hind limbs." She theorized that Jax "remained recumbent without adequate bedding over his tarsi which caused those wounds that then opened and then became infected."

- The State's expert, Dr. Carly Patterson, likewise testified that she concluded that Dr. Boehm did not provide necessary care to Jax, in that she failed to adequately provide Jax "the necessary boarding care in that he had had previous documentation of musculoskeletal abnormalities." She testified that "a prolonged period of recumbency, coupled with waste, feces and urine, in addition to not being moved contributed to these wounds."

Dr. Boehm nevertheless argues that the evidence is insufficient because there was no direct evidence that showed Dr. Boehm left Jax lying in his own waste. Rather, Havens "provided unchallenged testimony that she saw [Dr. Boehm] remove Jax from a dirty kennel and place him in a clean one" and that she gave Jax a bath. But circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Solis v. State*, 726 S.W.3d 394, 404 (Tex. Crim. App. 2025); *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). And that circumstantial evidence, as outlined above, was present here.

Dr. Boehm also points to Dr. Patterson's acknowledgment that urine scalding can occur "in spite of excellent boarding care" and that in some situations, "nothing short of full hospitalization would prevent urine scalding," and Dr. Vaughn's acknowledgment that the scalding could have come from a "cleaning detergent." But we are not at liberty to rely on the disavowed alternative-reasonable hypotheses doctrine. *David v. State*, 663 S.W.3d 673, 682 (Tex. Crim. App. 2022). Dr. Boehm argues that the jury could not have rationally inferred that she "knowingly left Jax lying in his own urine for an unreasonable period. To make that logical leap, the jury had to engage in speculation." Again, the State was not required to prove a knowing state of mind. *See*, *e.g.*, *Mouton v. State*, 513 S.W.3d 679, 680 (Tex. App.—San Antonio 2016, no pet.). We find that the evidence before the jury—when looked at in the light most favorable to the jury's verdict as we are obligated to do—allowed the jury to rationally conclude beyond a reasonable doubt that Dr. Boehm recklessly and unreasonably failed to provide Jax necessary care by failing to remove Jax from his waste. *Jackson*, 443 U.S. at 315–16; *Hooper*, 214 S.W.3d at 13. We overrule Dr. Boehm's sufficiency argument and turn to Dr. Boehm's jury-charge issues.

11

### *Jury Charge*

Dr. Boehm argues that there were two errors in the trial court's jury charge, each causing egregious harm. First, the trial court instructed the jury it could convict her based on an act—the act of administering contraindicated medication—that does not constitute an offense under subsection 42.092(b)(3) and was in any event unsupported by the evidence. Second, the trial court instructed the jury it could convict her if it found she had a reckless mens rea, a culpable mental state that does not apply to the offense set out in subsection 42.092(b)(3).

### *Standard of Review*

We must review all alleged jury-charge error, regardless of preservation in the trial court. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). The first question in analyzing a jury-charge issue is whether the charge contains error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Then, if the charge contains error, we analyze that error for harm. *Id*. If there was not a timely objection, the record must show "egregious harm." *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). "An erroneous jury charge is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory." *Id*.

### *Application*

Jury charge on the act of administering contraindicated medication

Dr. Boehm first argues that the trial court erred in including this third theory of the case because it did not constitute an offense under subsection 42.092(b)(3), which requires proof of a failure to act; prescribing and/or administering medications which are contraindicated can only be an act, never an omission. But the definition of "necessary care" indicates that the

12

statute criminalizes acts of care that are inadequate to keep the animal healthy. Tex. Penal Code § 42.092(a)(7), (b)(3). Again, necessary food, water, care, or shelter includes food, water, care, or shelter provided to the extent required to maintain the animal in a state of good health. *Id*. The statute thus covers an animal, though fed, watered, and cared for (all acts) when that feeding, watering, or care does not rise to the level required to maintain the animal in a state of good health. *See Thomas v. State*, 352 S.W.3d 95, 100 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). Based on a plain reading of the statute, we disagree with Dr. Boehm that acts cannot constitute means under subsection 42.092(b)(3).

Second, Dr. Boehm argues that the contraindicated-medication theory lacked evidentiary support and therefore should not have been included in the jury charge. *See Sanchez v. State*, 376 S.W.3d 767, 774 (Tex. Crim. App. 2012) (jury instructions were erroneous in their inclusion of unknown manner-and-means theories where evidence showed closed universe of possibilities regarding manner and means). At trial, Dr. Boehm asked for a directed verdict on the third theory due to a "complete failure of proof on that" and the State's reliance on a veterinarian's duty under the administrative code. The trial court overruled the objection but gave a limiting instruction.[3]

Here, the jury had before it evidence of the State's theory. As Dr. Boehm points out, the jury was presented with competing expert testimony on whether the administration of

---

[3] The trial court instructed,

> Ladies and gentlemen of the jury, there has been some evidence of a veterinarian's duty under the administrative code. You are instructed that the State is not alleging any allegations under the administrative code in its charging instrument, and the existence of an administrative duty does not equate to a criminal offense alleged in this case. Furthermore, the existence of an administrative duty does not create a higher burden of care and should not be taken for that purpose in this case.

the drugs was inconsistent with necessary care. The jury heard that Dr. Boehm prescribed Jax Galliprant, a nonsteroidal anti-inflammatory medication, for his osteoarthritis from March 13 to 18, and then on March 19, she began giving him prednisone. Dr. Vaughn testified giving an animal Galliprant close in time to prednisone was not advised because it could cause stomach ulceration and other side effects, and "[p]rior to Jax presenting in the hospital, he was reported to have regurgitation" and "then regurgitated throughout the first couple of days of hospitalization every time his stomach was touched and every time that he was really evaluated and spontaneously when he was in his cage as well."

Similarly, Dr. Patterson testified that she would not prescribe Galliprant and prednisone concurrently and would recommend an extended period of "at least five days, if not seven days" for washout. Doing otherwise risks gastrointestinal ulceration. The Defense's expert, Dr. Conklin testified, "Galliprant was a great drug to pick because as a nonsteroidal, and one with a short half life, meaning it is metabolized and cleared from the body very quickly, if I look at the situation, I go, Jax isn't doing much better on the Galliprant, I can take that out of the picture very quickly and then make the decision to start the steroid if needed." Dr. Conklin stated that a ten-to-twelve hour time between the administration of the two drugs was adequate for a washout, and it made sense that Dr. Boehm changed courses of action when she realized that the Galliprant was not helping. Dr. Conklin testified that problems arise if you give the two drugs "together, meaning at the same time," which was not done here.

Because the State put on evidence supporting its third theory, we hold the trial court did not err in submitting it to the jury. *Cf. Barron v. State*, 353 S.W.3d 879, 883-84 (Tex. Crim. App. 2011) (synergistic theory of offense was unsupported by evidence and should not have been included in jury charge). We overrule Dr. Boehm's first jury-charge complaint.

14

<u>Including recklessness in the jury charge</u>

Dr. Boehm's argument here mirrors that made in her sufficiency complaint. As we held above, the trial court did not err in including recklessness in the jury charge. We overrule Dr. Boehm's second jury-charge complaint.

## CONCLUSION

Having overruled Dr. Boehm's sufficiency and jury-charge complaints, we affirm the trial court's judgment.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Affirmed

Filed:  March 6, 2026

Publish

15